UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN PANZELLA and JOEMARK ENTERPRSES, LLC,

Plaintiffs,

-v-

CITY OF NEWBURGH,

Defendant.

Case No. 15-CV-9826 (KMK)

OPINION & ORDER

Appearances:

Michael H. Sussman, Esq.
Sussman & Watkins
Goshen, NY
*Counsel for Plaintiffs*

David L. Posner, Esq.
McCabe & Mack LLP
Poughkeepsie, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Plaintiffs John Panzella ("Panzella") and Joemark Enterprises, LLC ("Joemark") (collectively, "Plaintiffs") filed this Action pursuant to 42 U.S.C. § 1983 against the City of Newburgh (the "City"), alleging that the City denied them equal protection of the law out of a malicious, bad-faith intent to destroy their businesses. (Am. Compl. ¶ 3 (Dkt. No. 13).)[1] Before the Court is the City's Motion To Dismiss the Amended Complaint (the "Motion") pursuant to

[1] The Court notes that Plaintiffs misspelled "Enterprises" as "Enterprses" in the caption of the Amended Complaint. The Court adopts that spelling only for purposes of the caption of this Opinion.

Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 19.) For the reasons explained herein, the City's Motion is granted.

I. Background

A. Factual Background

The following facts are taken from the Amended Complaint, and are taken as true for purposes of the Motion.[2]

Panzella is the owner and president of Joemark. (Am. Compl. ¶ 1.) In 2000, he purchased the River Rose, a 64-foot New Orleans paddle-wheel cruise boat, for the purposes of hosting passengers on trips along the Hudson River from a dock in the City of Newburgh. (*Id.* ¶ 4.) Joseph Bonura ("Bonura"), "a prominent Newburgh restauranteur," initially served as Panzella's business partner in the operation of the River Rose, but Panzella bought him out in 2001. (*Id.* ¶¶ 5–6.) Following that transaction, Bonura "became extremely hostile to [P]laintiffs' business plans." (*Id.* ¶ 6.)

In 2002, Plaintiffs began seeking approval to install a dock to park the River Rose on municipal property at the Newburgh waterfront. (*Id.* ¶ 7.) That process continued until mid-2003, when the City of Newburgh Planning Board ("Planning Board") unanimously "granted approval of [P]laintiffs' site plan subject only to their securing all necessary approvals and permits from Federal and State regulatory agencies with jurisdiction over the project." (*Id.* ¶ 13 (internal quotation marks omitted).) Then, on March 29, 2004, the Newburgh City Council ("City Council") authorized the City Manager to enter into an agreement and lease with Joemark

[2] The City has submitted 10 exhibits it argues the Court can consider on this Motion. (*See* Aff. of David Posner, Esq. (Dkt. No. 20).) Plaintiffs argue that the Court cannot consider certain of these exhibits at this stage of the litigation. Because the Court does not rely on any of the documents submitted by the City in ruling on the Motion, the Court need not resolve this dispute.

"to allow for the construction and use of a dock with a buy back to the City of the completed dock for $1.00." (*Id.* ¶ 15.) Plaintiffs and the City entered into an agreement (the "Agreement") on April 5, 2004, whereby the City agreed to allow Panzella to build a dock at 70 Front Street, Newburgh, for the River Rose, to sell back the dock to the City for $1.00 once it was completed, and to then lease the dock for up to 20 years. (*Id.* ¶ 16.) The Agreement further provided that the River Rose "shall have the right . . . to connect to and make use of necessary utilities at the waterfront, specifically: electricity, water supply[,] and sewage disposal." (*Id.* ¶ 19 (internal quotation marks omitted).)

After the Agreement was signed, businesses operating along the waterfront in Newburgh, including one owned by Bonura, expressed strong opposition to Plaintiffs' operation. (*Id.* ¶¶ 20–21.) The City, responding to the pressure exerted by these businesses, refused to comply with the terms of the Agreement. (*Id.* ¶ 22.) It falsely claimed that Plaintiffs' building plans for the dock were invalid and denied that it was required to provide utilities for Plaintiffs' use. (*Id.*)

Plaintiffs commenced building the dock contemplated by the Agreement in April 2004 after filing an application for and paying for a building permit. (*Id.* ¶ 23.) After three months of construction, the City, "under pressure [from] the [aforementioned] business interests," issued a stop work order. (*Id.* ¶ 24.) Panzella went and spoke to the City's building inspector, who issued a new building permit. (*Id.* ¶ 26.) One week later, however, the building inspector issued a second stop work order. (*Id.* ¶ 27.)

Other waterfront businesses continued to oppose the construction of the dock during this period. The restaurant owners threatened to shut down all parking at the waterfront and to file a lawsuit against the City. (*Id.* ¶ 28.) Furthermore, in mid-April 2004, Rizzo, one of Plaintiffs' competitors, told Klein that "anyone who attempted to help John Panzella in obtaining his dock,

will be looked upon with disfavor by the officials of the City of Newburgh and other members of the waterfront area." (*Id.* ¶¶ 29–30 (internal quotation marks omitted).)[3] Rizzo directed Klein to send a letter to the City's Building Department stating that the original building plans submitted for the dock were not actually building plans, but were only design plans. (*Id.* ¶ 30.) Klein complied with this request. (*Id.* ¶ 31.)

In mid-June 2004, counsel for the businesses that opposed Plaintiffs' operations demanded that the City deny Plaintiffs' utility site plan. (*Id.* ¶ 32.) Shortly thereafter, counsel for these entities also demanded that the City shut down construction of the dock, citing Klein's revocation of his signature from the submitted building plans. (*Id.* ¶ 34.) In August 2004, Plaintiffs' competitors filed an Article 78 proceeding seeking the revocation of the Planning Board's approval of Plaintiffs' project and Plaintiffs' opponents on the City Council introduced a resolution to rescind the Agreement. (*Id.* ¶¶ 35, 38.) The resolution, however, was tabled. (*Id.* ¶ 38.) In light of these actions, the City Manager declared that the City was in a holding pattern with regard to allowing Plaintiffs to finish the dock. (*Id.* ¶ 36.)

As a result of the stop work orders and the opposition to the project, Plaintiffs hired a new architect to draw a building plan for the dock. (*Id.* ¶ 39.) The City, however, continued to frustrate Plaintiffs' attempt to finish the dock. (*Id.* ¶ 41.) Specifically, the City's building inspector claimed that the newly drafted plans were inadequate because they did not contain an original signature and seal even though the plans were allegedly in compliance with those requirements. (*Id.* ¶ 42.) In March 2005, the building inspector allegedly rejected the plans because they were not signed and stamped and did not include certifications for the work that

[3] The Court is left to wonder as to who Klein and Rizzo are. It appears Klein is an architect and the creator of the building plans for the dock.

had already been completed. (*Id.* ¶ 43.) The building inspector thereafter subjected the dock to a series of "costly and unprecedented" stress tests. (*Id.* ¶¶ 44–45.) The dock passed the tests. (*Id.* ¶ 46.)

Plaintiffs continued to have difficulties with the building inspector and the City for several years. (*See id.* ¶¶ 47–52.) The City refused to issue a Certificate of Compliance once the dock was completed and then claimed that extension of utilities was not required by the Agreement. (*Id.* ¶¶ 49, 52.) Finally, in January 2009, the City Council "resolved to permit the City Manager to enter an amended agreement with [P]laintiffs allowing the extension of utilities to the River Rose." (*Id.* ¶ 59.) The resolution contained a series of steps Plaintiffs had to follow before getting a temporary connection. (*Id.* ¶ 60.) Plaintiffs allegedly complied with all of them. (*Id.* ¶ 61.) The City, however, has continued to erect barriers to the extension of utilities. (*Id.* ¶ 62.) Plaintiffs allege that the City's refusal to honor its commitments stems from the influence of the business owners who oppose the dock project and Plaintiffs' operations. (*Id.* ¶ 63.)

In May 2009, Plaintiffs allege that the City's Corporation Counsel falsely claimed that Plaintiffs failed to submit utility plans for review. (*Id.* ¶ 64.) The following day, Plaintiffs requested leave to provide services from the City's public bathroom. (*Id.* ¶ 65.) The request was denied three months later. (*Id.* ¶ 66.) Corporation Counsel then advised Plaintiffs to seek leave for a temporary connection from the City Engineer. (*Id.* ¶ 67.)

On October 29, 2009, Plaintiffs' counsel requested that the City comply with the terms of the Agreement and tender the lease contemplated thereunder. (*Id.* ¶ 69.) The City did not comply with this request. (*Id.* ¶ 70.) Furthermore, the City Building Department claimed that it could not provide utility services from the public bathroom facilities located near the dock. (*Id.* ¶ 71.)

In 2010, Plaintiffs again requested that the City tender a lease and extend utilities to the dock. (*Id.* ¶ 72.) The City, however, by resolution dated April 12, 2010, revoked the resolutions that authorized the Agreement and set forth "new and inconsistent terms for any new agreement." (*Id.* ¶ 73.) Any new agreement would prohibit Plaintiffs from assigning the agreement to any other vessel, require Plaintiffs to vacate the dock for up to five days during its season, and require Plaintiffs to maintain and repair the dock at their expense. (*Id.*)

In Spring 2013, Plaintiffs sought to engage the City in discussion about whether it would lease the dock to them. (*Id.* ¶ 77.) Plaintiffs allege that the City has not tendered a lease agreement or provided a connection to any utilities. (*Id.* ¶ 78.) Plaintiffs contend that the City's position is motivated by a desire to please the powerful interests opposed to the River Rose's operation. (*Id.* ¶ 79.)

Plaintiffs allege that their treatment stands in stark contrast to the way the City has treated other waterfront business. (*Id.* ¶ 82.) Plaintiffs state that the City "assiduously" helped the Pride of the Hudson, a vessel providing sightseeing cruises and charter rides along the Hudson River, find space to dock on the waterfront in 2014-2015. (*Id.* ¶¶ 82–83, 91–92.) The City allegedly has no "good faith basis or rational reason" for treating Plaintiffs in an inferior manner to the other aspiring businesses along the waterfront "for whom the City has bent over backwards in an effort to spur economic development." (*Id.* ¶ 97.)

Finally, Plaintiffs allege that it was harmed by the City's discriminatory "custom and practice" when the City refused to vouch for the ongoing validity of the Agreement to a prospective purchaser of the River Rose. (*Id.* ¶¶ 84–85.) As a result, the purchaser withdrew his bid. (*Id.* ¶ 86.)

B. Procedural History

Plaintiffs commenced this Action by filing a Complaint on December 17, 2015. (Dkt. No. 1.) The City filed a pre-motion letter on January 26, 2016, seeking to dismiss the Complaint for failure to state a claim. (Dkt. No. 9.) On February 26, 2016, Plaintiffs filed the Amended Complaint. (Dkt. No. 13.) Pursuant to a Scheduling Order issued by the Court on May 18, 2016, (Dkt. No. 18), the City filed the Motion and accompanying papers on June 30, 2016, (Dkt. Nos. 19–21). Plaintiffs filed papers in opposition to the Motion on July 22, 2016. (Dkt. No. 22.) The City filed a reply brief in further support of the Motion on August 5, 2016. (Dkt. No. 23.)

II. Discussion

Plaintiffs allege the City adopted an arbitrary and discriminatory policy or practice whereby Plaintiffs were treated less favorably than similarly situated waterfront businesses, such as the Pride of the Hudson. This disparate treatment, they argue, violates the Equal Protection Clause of the Fourteenth Amendment. The City contends principally that the Amended Complaint has failed to state a claim because Plaintiffs have not identified a similarly situated comparator, and even if they did, the equal protection claim is barred by the applicable statute of limitations. The Court finds the City's argument with respect to Plaintiffs' failure to plead a similarly situated comparator to be prevailing and therefore discusses only that argument below.

A. Standard of Review

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his [or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alterations, citations, and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil

Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alterations and internal quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In addition, "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Further, "[f]or the purpose of resolving [a] motion to dismiss, the [c]ourt . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to

facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Hendrix v. City of New York*, No. 12-CV-5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20, 2013) (same).

B. Applicable Law

"The Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). "Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, [the Second Circuit] ha[s] long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Id.* "Where . . . a plaintiff does not claim to be a member of a constitutionally protected class, he may bring an [e]qual [p]rotection claim pursuant to one of two theories: (1) selective enforcement, or (2) 'class of one.'" *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013) *see also Rankel v. Town of Somers*, 999 F. Supp. 2d 527, 544 (S.D.N.Y. 2014) (same).

To allege an Equal Protection Clause violation under a class-of-one theory, "the plaintiff must allege that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate governmental policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of mistake." *Fahs Constr. Grp., Inc. v. Gray*, 725 F.3d 289, 292 (2d Cir. 2013) (internal quotation

marks omitted). In other words, "a plaintiff asserting a 'class of one' equal protection claim must allege that the intentional disparate treatment alleged to state the first element of the claim was wholly arbitrary or irrational." *Vaher*, 916 F. Supp. 2d at 433 (some internal quotation marks omitted). Plaintiffs proceeding under this theory "must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (internal quotation marks omitted); *see also Crippen v. Town of Hempstead*, No. 07-CV-3478, 2013 WL 1283402, at *6 (E.D.N.Y. Mar. 29, 2013) (noting that plaintiffs seeking to state a class-of-one claim "must demonstrate that they were treated differently than someone who is prima facie identical in all relevant respects" (italics and internal quotation marks omitted)), *mot. to amend denied*, 2013 WL 2322874 (E.D.N.Y. 2013).

To state an equal protection claim "on a theory of selective enforcement or selective treatment, a plaintiff must show that: (1) 'he, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, or to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the plaintiff.'" *Vaher*, 916 F. Supp. 2d at 433 (alterations omitted) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)). "A plaintiff generally must satisfy both elements to establish a claim of selective enforcement," *LaTrieste Rest. v. Village of Port Chester*, 188 F.3d 65, 70 (2d Cir. 1999), though there is some disagreement within the Second Circuit regarding the degree of similarity necessary to adequately allege an equal protection claim under this theory, *see Butler v. Bridgehampton Fire Dist.*, No. 14-CV-1429, 2015 WL 1396442, at *4 (E.D.N.Y. Mar. 25, 2015) (recognizing the "split regarding the definition of 'similarly situated' in selective

enforcement and class-of-one cases"). While some courts evaluate whether a comparator is similarly situated under the same standard used in "class of one" equal protection claims, *see, e.g.*, *Kamholtz v. Yates County*, No. 08-CV-6210, 2008 WL 5114964, at *5 (W.D.N.Y. Dec. 3, 2008) (noting that "[t]he level of similarity between [the] plaintiffs and the persons with whom they compare themselves must be extremely high" in both the selective enforcement and class-of-one contexts (internal quotation marks omitted)), *aff'd*, 350 F. App'x 589 (2d Cir. 2009), others apply a less demanding standard to selective enforcement claims, *see, e.g.*, *Tower Props. LLC v. Village of Highland Falls*, No. 14-CV-4502, 2015 WL 4124499, at *8 (S.D.N.Y. July 7, 2015) (adopting "a less stringent standard" whereby the "[p]laintiff must identify comparators whom a prudent person would think were roughly equivalent" (alterations and internal quotation marks omitted)); *Vassallo v. Lando*, 591 F. Supp. 2d 172, 184 (E.D.N.Y. 2008) (explaining that a selective enforcement claim requires a plaintiff and comparator to be "similarly situated in all material respects" (internal quotation marks omitted)).

Generally, whether two comparators "are similarly situated is a factual issue that should be submitted to the jury." *Harlen Assocs.*, 273 F.3d at 499 n.2. However, the Second Circuit has held that this rule is "not absolute" and explained that "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Id.* Thus, at the summary judgment stage of selective enforcement claims, courts ask whether based on the evidence, a reasonable jury could conclude that the plaintiff and the proposed comparators are similarly situated. At the motion to dismiss stage, such evidence is not necessary; however, a court still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated. Thus, "[w]ell-pled facts showing that the plaintiff has been treated differently from

others similarly situated, remains an essential component of such a claim [and] [c]onclusory allegations of selective treatment are insufficient to state an equal protection claim." *Bishop v. Best Buy, Co.*, No. 08-CV-8427, 2010 WL 4159566, at *11 (S.D.N.Y. Oct. 13, 2010) (citation and internal quotation marks omitted) (dismissing the plaintiff's equal protection claim because he failed to allege any similarly situated individuals who were treated differently); *see also DePrima v. City of N.Y. Dep't of Educ.*, No. 12-CV-3626, 2014 WL 1155282, at *6 (E.D.N.Y. Mar. 20, 2014) (dismissing selective enforcement claim where the plaintiff's allegations lacked "any facts showing that [certain individuals] [were] similarly situated to [the] [p]laintiff" (emphasis omitted)); *Segreto v. Town of Islip*, No. 12-CV-1961, 2014 WL 737531, at *7–8 (E.D.N.Y. Feb. 24, 2014) (dismissing equal protection claim where the "[p]laintiffs merely allege[d] that others [were] allowed to get permits, but it [wa]s unclear whether those properties ha[d] any circumstances similar to [the] [p]laintiffs"); *Vaher*, 916 F. Supp. 2d at 434 ("While a plaintiff is not required to proffer evidence of similarly situated individuals at the motion to dismiss stage, the court 'still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated.'" (quoting *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 697–98 (S.D.N.Y. 2011)).

C. Analysis

The City contends that Plaintiffs have not adequately alleged a similarly situated comparator and therefore the Amended Complaint must be dismissed. Plaintiffs respond that they have adequately identified the Pride of the Hudson and other waterfront businesses as similarly situated comparators. Specifically, Plaintiffs state that the City "extend[ed] itself to provide a safe landing space for [the] Pride of the Hudson" while engaging in the "polar opposite

conduct" toward them. (Pls.' Mem. of Law in Opp'n to Mot. 16 (Dkt. No. 22) (internal quotation marks omitted); *see also id.* at 16–17 (arguing that municipal officials extended "substantial courtesies and opportunities" to the Pride of the Hudson).)

The Amended Complaint alleges that the Pride of the Hudson is a "vessel which serve[s] food and drink" and conducts sightseeing cruises and charter rides along the Hudson River. (Am. Compl. ¶¶ 82–83.) The City allegedly assisted the Pride of the Hudson in finding dock space "during the 2014–2015 time period." (*Id.* ¶¶ 82, 91–92.) Other than these allegations, the Amended Complaint contains conclusory statements that the City "supported other entrepreneurs engaging in similar commercial enterprises," (*id.* ¶ 82), and favored the interests of other waterfront businesses over the interests of the River Rose, (*id.* ¶ 97). Regardless of which standard the Court applies—the "extremely high degree of similarity" standard used in class-of-one cases or the less demanding standard some courts apply to selective enforcement claims—these allegations fall far short of identifying a similarly situated comparator. *See MacPherson v. Town of Southampton*, 738 F. Supp. 2d 353, 371 (E.D.N.Y. 2010) (dismissing equal protection claim, "whether pled as a selective enforcement claim or a class-of-one claim," because the complaint did not identify any similarly-situated entities).

While the Pride of the Hudson and the River Rose are vessels that operate along the Hudson River, that is where the similarities end. The gravamen of Plaintiffs' equal protection claim is that the City breached the Agreement at the direction of opposing business forces and interfered with Plaintiffs' ability to utilize the dock they built and to obtain utilities for that dock, thereby damaging the resale value of the River Rose. Without the City honoring the Agreement, Plaintiffs allege they cannot sell the River Rose. (Am. Compl. ¶ 87.) Plaintiffs have not alleged, however, that the City treated the Pride of the Hudson, or any other waterfront business, more

favorably under similar circumstances. For example, Plaintiffs have not alleged that the City has honored a contract similar to the Agreement with any other business, that the City has offered to lease a municipal dock to the Pride of the Hudson, that the Pride of the Hudson has been extended temporary utilities to operate its business, or that the Pride of the Hudson received a benefit that the River Rose did not obtain. The only alleged benefit that the Pride of the Hudson received from the City is help in finding dock space. (*See id.* ¶ 91.) But Plaintiffs do not allege that they requested such assistance from the City and were denied. More importantly, Plaintiffs do not allege that the owners of the Pride of the Hudson had or sought a contract with the City akin to the Agreement. Indeed, the Amended Complaint says nothing about the contractual relationship between the owners of the Pride of the Hudson and the City, thus sinking any claim that the Pride of the Hudson is comparable to the River Rose for equal protection purposes. Therefore, no reasonably prudent person could plausibly view Plaintiffs' circumstances as being roughly equivalent to that of the Pride of the Hudson. *See Viteritti v. Incorporated Village of Bayville*, 918 F. Supp. 2d 126, 135–36 (E.D.N.Y. 2013) (dismissing equal protection claim where the plaintiffs "failed to articulate how their property could be viewed by a reasonably prudent person as being roughly equivalent to the comparator properties"); *Yajure v. DiMarzo*, 130 F. Supp. 2d 568, 572 (S.D.N.Y. 2001) (stating that the "test for determining whether persons similarly situated were selectively treated is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent," and dismissing equal protection claim because the circumstances of the plaintiff and the alleged comparator were not "roughly equivalent" (internal quotation marks omitted)).

Plaintiffs' allegations that other waterfront businesses were treated more favorably are similarly insufficient to state a claim. Plaintiffs failed to identify those businesses or the way in

which the City treated those entities better than it treated them. *See Ruston*, 610 F.3d at 59 (affirming dismissal of equal protection claim against certain defendants where the plaintiff failed to plead "specific examples" of disparate treatment); *Norton v. Town of Brookhaven*, 33 F. Supp. 3d 215, 239–40 (E.D.N.Y. 2014) (holding that the plaintiff failed to satisfy the first element of a selective enforcement claim because he made only "a conclusory reference to unspecified similarly situated persons without accompanying examples"), *reconsideration granted*, 47 F. Supp. 3d 152 (E.D.N.Y. 2014); *Parkash v. Town of Southeast*, No. 10-CV-8098, 2011 WL 5142669, at *8 (S.D.N.Y. Sept. 30, 2011) (dismissing selective enforcement claim where the plaintiff alleged only "a conclusory reference to unspecified similarly situated persons without accompanying examples"), *aff'd*, 468 F. App'x 80 (2d Cir. 2012); *see also New Page at 63 Main, LLC v. Incorporated Village of Sag Harbor*, — F. App'x —, 2016 WL 7436612, at *3 (2d Cir. 2016) (dismissing class-of-one claim where the plaintiffs, who operated a restaurant with outdoor dining space, "vaguely" referred to other restaurants with outdoor seating, but failed to identify a comparator "with sufficient specificity" to state a claim).

Simply put, Plaintiffs are attempting to turn what appears to be a breach of contract action into an equal protection claim. In doing so, however, Plaintiffs have failed to plead the requisite elements. Accordingly, Plaintiffs' equal protection claim is dismissed.

III. Conclusion

In light of the foregoing analysis, the Court dismisses the Amended Complaint with prejudice.[4] The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 19), and to close the case.

SO ORDERED.

DATED: February 8, 2017
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

[4] As the Court's ruling is grounded on Plaintiffs' failure to plead a cause of action, and Plaintiffs have already amended their Complaint in response to the City's first attempt to file a motion to dismiss, (*see* Dkt. No. 9), the Court declines to provide Plaintiffs with another opportunity to file an amended pleading, *see Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (holding that the plaintiff was not entitled to "a third go-around"); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *24 n.19 (S.D.N.Y. Mar. 29, 2016) (granting motion to dismiss with prejudice where "[the] [p]laintiff has already had two bites at the apple, and they have proven fruitless" (alteration and internal quotation marks omitted)).